408 So.2d 1376 (1982)
Obadiah COLLINS
v.
STATE of Mississippi.
No. 52974.
Supreme Court of Mississippi.
February 3, 1982.
*1377 Chill, Chill & Dove, Bernard W.N. Chill, Jr., Jackson, for appellant.
Bill Allain, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and BROOM and DAN M. LEE, JJ.
PATTERSON, Chief Justice, for the Court:
In the Circuit Court of Rankin County Obadiah Collins, in a joint trial with George Williams, was convicted of armed robbery and sentenced to fifteen years in the Mississippi Department of Corrections, with five years suspended.
On January 18, 1980, Ms. Jimmie Morgan, an employee of Institutional Foods Distributors, was robbed as she was taking a deposit to the bank for her employer. At approximately 10:40 a.m. Ms. Morgan left her place of employment carrying a basket of bank deposit bags to her car. She placed it on the backseat of her automobile, then sat down on the backseat and leaned across it to pick some paper off the floor on the opposite side of the vehicle. While she was leaning over a black male approached the car and, as she raised up, pointed a gun at her and commanded that she stay down. After seizing the basket of bank bags and the employee's purse, the assailant went to a car parked perpendicular to Ms. Morgan's vehicle. As he was walking away, Ms. Morgan again raised herself up, at which time another black male, seated in the driver's seat of the getaway car, yelled at her to stay down. As the car departed Ms. Morgan observed its color and obtained its license plate number.
Ms. Morgan described her accoster to the police as a dark complexioned black man with a scar under his eye on the right side of his face. She stated he was 5'10" tall, 160 lbs., with slim build, medium length afro haircut and slender face and that he spoke with a speech impairment. She identified Obadiah Collins in court as the man who robbed her. She also described the driver of the getaway car as a black male with a gold tooth, goatee, sunglasses, and hat. She identified George Williams, co-defendant, in court as the driver of the getaway vehicle.
On the evenings of January 18 and 19, 1980, Ms. Morgan was shown a group of approximately 20 photographs of black males by the police of the City of Pearl. On both occasions she identified the co-defendant George Williams. On March 19, 1980, she was shown another group of approximately 15 photographs of black males. A few days after that another group of photographs was displayed to her. Each time she identified a photograph of Obadiah Collins as the person who robbed her. This photograph revealed Collins as a heavyset, full faced man; evidence was introduced that he weighed approximately 200 pounds.
The license tag number observed by Ms. Morgan was traced and disclosed the getaway car was registered to the defendant George Williams.
Collins testified in his own behalf, stating that he worked as a driver for Jackson Packing Company. Collins testified that on January 18, 1980, he went to work at approximately 2:00 a.m. to take a load of meat to an A&P warehouse in New Orleans, Louisiana, where he arrived about 7:00 a.m. and unassisted, transferred the boxes of meat from the truck onto a pallet for removal by the warehouse employees. He testified this task was completed about 9:45 a.m. and that he had the merchandise checked and the drayage ticket stamped and signed. He further testified that he *1378 left New Orleans returning to Jackson at approximately 10:00 a.m. Collins stated that he stopped enroute in Brookhaven, Mississippi, for gas for which he paid in cash and received a receipt. Upon arriving in Jackson at approximately 3:00 p.m. he cleaned the truck, turned in his sheet, turned in the cash ticket for the gas he had purchased, and received a refund. He testified that upon his return he spoke with John McAllister, his supervisor.
John McAllister, a shipping foreman at Jackson Packing Company, testified that he was not at the Jackson Packing Company at 2:00 o'clock a.m. on January 18, and did not see Collins leave in the truck. However, he did see him when he returned that afternoon. McAllister testified that there is no log for drivers to sign in and out as they leave in a truck, but there is a watchman at the locked gate who verifies the drivers by sight. He testified that Collins was chosen as the driver for the New Orleans trip because he was one of two or three drivers for Jackson Packing Company certified by the Interstate Commerce Commission to cross state lines.
Various documents concerning Collins' alibi were introduced into evidence. Collins' timecard showed that he had punched in for work at approximately 2:00 o'clock a.m. on January 18 and punched out at approximately 4:00 o'clock p.m. the same day. The card was initialed by McAllister to verify the time worked by Collins. A handwritten memo of McAllister, showing that Collins was assigned to the New Orleans route on January 18, 1980, was also introduced. The cash receipt for the gas, showing Collins name and McAllister's initials authorizing repayment to Collins, was also introduced into evidence. There was also a Jackson Packing Company sales ticket showing the purchaser of meat as the A&P warehouse, the amount of purchase, and the January 18, 1980, date of purchase.
The receiving clerk from the warehouse in New Orleans testified that he signed the dray receipt indicating receipt and approval of the shipment from Jackson Packing Company on January 18, 1980, whereupon the receipt was introduced into evidence. The clerk did not recall Obadiah Collins, but stated that 15 to 22 trucks came to the warehouse every day with numerous drivers. Additional documents from the warehouse were introduced indicating that on January 18, 1980, a Jackson Packing Company truck arrived at 7:20 a.m. and was released at 9:45 a.m. The A&P warehouse manager testified that any person entering the A&P warehouse through the gate was required to sign in with the guard. However, their security logs are destroyed after 30 days and since this time had expired they were no longer available.
One of the attorneys representing Collins testified about one phase of his investigation of the case. He stated that he went to the gas station in Brookhaven to ascertain if anyone there recalled selling gas to a Jackson Packing Company truck on the date in question. He testified that no one could remember who had been on duty that particular day. The state responded by calling an employee of the gas station in Brookhaven who testified about the usual procedure for issuing a cash receipt. He testified that the purchaser's name was usually placed on the top of the form, not at the bottom as it was on Collins' receipt, and that the salesman would usually write his signature on the receipt. There was no salesman's signature on the receipt in question, instead there were initials which the employee did not recognize. This employee named the persons who he believed worked the daylight hours of January 18, 1980, and none of the initials on the receipt corresponded with those employees.
A Pearl police officer was called in rebuttal by the state and testified that after Collins was read his Miranda rights he was asked if he knew George Williams and that he responded that he did not. This contradicted Collins' testimony at trial that he knew Williams. Another officer testified in rebuttal that when Collins came to pick up *1379 his personal property after being released on bond, he was asked if he had seen Williams lately and Collins responded by stating he had just talked to Williams on Highway 80.
The jury found Obadiah Collins guilty of armed robbery.[1] He appeals to this court, assigning numerous errors of the trial court for reversal, foremost of which concerns the conduct of the district attorney and his assistant during the course of the trial. Collins contends that the cumulative effect of the different instances of improper conduct was to prejudice the jury and deny him a fair and impartial trial. In support of his argument Collins cites several examples of alleged misconduct by the state's attorneys.
The first instance of alleged misconduct occurred during the state's examination of Ms. Morgan. The district attorney attempted to demonstrate the prone position of the witness as she was reaching across the backseat of her automobile at the time of the robbery by lying down on the floor in front of the jury and attempting to portray her position. An objection was made several minutes after this display. The trial court, in overruling the objection, stated that it was untimely, and that the posture of the state's attorney was no different from other gestures that attorneys made while interrogating witnesses.
Collins next complains of questions asked Collins' supervisor from Jackson Packing Company, John McAllister, by the assistant district attorney. These queries sought McAllister's opinion concerning the credibility of Collins' testimony and the documents from the Jackson Packing Company by the following questions and answers:
Q. And we're taking Obadiah's word that he is the one who punched that time slot there, is that correct? Is that a fair statement?
A. That is correct.
Q. Okay, in other words, if Obadiah is being honest with us, then these documents back up his testimony, do they not?
A. That's correct.
Q. But if he is being dishonest with us 
Collins objected, claiming that the documents spoke for themselves and that the jury was entitled to draw its own opinion from the documents and testimony. The objection was overruled.
The other instances of conduct which we believe merit comment and to which Collins' objects as improper were comments made by the district attorney and his assistant in their closing arguments to the jury. The assistant district attorney commented on Collins' failure to call certain witnesses to testify and on Collins' prior criminal record, although no evidence of past criminal convictions was presented during the trial. He stated:
Why didn't they bring that guard up here if the guard could recognize him as taking the truck off. Because the guard never saw him, that's why. Why didn't they bring the other folks? ... I submit to you ladies and gentlemen, another one of those drivers made that trip for Obadiah. Obadiah is a sophisticated criminal.
An objection was interposed and sustained, and the jury was instructed to disregard the comments.
The assistant district attorney, however, continued this line of argument by stating that Collins had cased Institutional Foods for several days prior to the robbery. Objection was made and sustained by the trial judge who stated:
The jury has been adequately instructed ... by the written instructions that any comment or argument of counsel that has no foundation in the evidence is to be disregarded, so it is for the jury primarily to determine whether these arguments have any foundation in the evidence. *1380 Yet immediately after the court's statements, the assistant district attorney persisted, "I believe Obadiah Collins watched and knew the procedure." Objection was made again. The court in overruling the objection stated:
I'm going to overrule the objection, but I am going to caution you to do your best to keep your argument within the bounds of the evidence. And I specifically instruct the jury to disregard any statement ... that you find has no basis in the evidence.[2]
In his rebuttal argument, the district attorney commented that the co-defendant, George Williams had produced the names of his witnesses as "he was supposed to do... . The other side didn't." An objection was interposed but was overruled. Collins complains of that comment because, under the Mississippi Uniform Criminal Rules of Circuit Court Practice, the defendant must produce a list of the names of his witnesses only after a written demand by the prosecuting attorney. There had been no such written demand in the present case.
We are of the opinion that the cumulative effect of the conduct of the district attorney and his assistant was to prejudice the jury against Obadiah Collins and deny him a fair trial, as required by due process of law. While the trial court, in some instances, sustained the objections made by Collins and admonished the jury to disregard some of the comments, we find that such action was insufficient to avoid prejudice to the appellant. The reference to non-existent testimony, the innuendos arising from the defendant's not calling witnesses, which were readily available to the state, and the beliefs of the assistant district attorney, again not supported by the evidence, were such that they could not be removed, in our judgment, from the minds of the jurors by the judge's admonishments. As is evident this case presents a close question as to the guilt of Collins. In reality it was the testimony of Ms. Morgan, who identified Collins, versus that of Collins who presented alibi evidence which was corroborated to the extent mentioned. In such situation, the conduct of the state's attorneys had the likely probability of prejudicing the jury, thereby denying the defendant a fair and impartial trial.
We recently stated in Henderson v. State, 403 So.2d 139, 140 (Miss. 1981):
In most cases, when an objection is made to improper questions by a district attorney and the court sustains the motion and admonishes the jury to disregard the improper questions and evidence, we have held that any prejudice created by the questions was cured and the trial court properly overruled the motion for a mistrial. Reid v. State, 266 So.2d 21 (Miss. 1972); Thomas v. State, 285 So.2d 148 (Miss. 1973). However, in the final analysis, each case must be decided on its own peculiar facts. If the only error presented in this case was that the district attorney had inquired of the defense witness, Ricky Scott, whether he had been indicted by the grand jury for the burglary of a dwelling house, we would probably hold that the court's admonishment to the jury to disregard such statement cured any prejudice caused by the question, even though we have stated many times that similar questions by a district attorney were improper.
In Henderson we reversed and remanded for a new trial because of the prejudicial effect upon the jury in spite of the trial court's admonitions.
As we stated in Henderson, this court has previously and repeatedly stated that certain comments are improper. E.g., Morgan v. State, 388 So.2d 495 (Miss. 1980). We are *1381 of the opinion, under the circumstances of this case, the prejudicial effect upon the jury was so great that the court's admonitions to disregard improper statements and allusions to evidence not in the record were given in vain. To insure that Collins receives his constitutional right to a fair and impartial hearing, we reverse and remand for another trial.
REVERSED AND REMANDED FOR A NEW TRIAL.
SMITH and SUGG, P. JJ., and WALKER, BROOM, ROY NOBLE LEE, BOWLING, HAWKINS and DAN M. LEE, JJ., concur.
NOTES
[1] The jury could not reach a verdict as to the guilt or innocence of co-defendant Williams and a mistrial was declared as to him.
[2] There is no evidence that anyone other than Collins drove the truck to New Orleans. Likewise there is no evidence to support the state attorney's belief that Collins "watched and knew the procedure" although there was testimony that Collins had previously worked for Institutional Foods, Inc., and that the bank deposit procedures were routine and probably known by its employees which would have included Collins.